## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

IN RE:

Dockside Association, Inc.,

                                                    Debtor.

C/A No. 25-05115-jd

Chapter 11

**ORDER DENYING RELIEF
FROM STAY**

**THIS MATTER** is before the Court on the Motion for Relief from Stay

("Motion") filed by William R. Wiggins ("Wiggins") on February 16, 2026.[1] Dockside

Association, Inc. ("Dockside", "Debtor", or the "Association") filed an objection to the

Motion.[2] Wiggins and Dockside both appeared for a hearing on the Motion on March

18, 2026.

The Motion requires the Court to determine whether "cause" exists under 11

U.S.C. § 362(d)(1) to permit a condominium co-owner to continue prepetition

litigation against Dockside and certain insurers. At the center of the dispute are

competing interests in potential insurance recoveries arising from the evacuation of

the condominium complex. Dockside contends these proceeds are among the estate's

most significant assets and are essential to its Chapter 11 restructuring strategy.

Having considered the Motion, the objection thereto, the record, and the arguments

of counsel, the Court denies the Motion, without prejudice, for the reasons set forth

below.

---

[1] ECF No. 103.
[2] ECF No. 121.

1

## BACKGROUND

The Dockside condominium complex is a 142-unit condominium regime located at 330 Concord Street in Charleston, South Carolina (the "Condominium Complex"). The Condominium Complex occupies highly valuable real property on the Charleston peninsula. Prior to the petition date, structural evaluations of the Condominium Complex revealed significant deficiencies in slab-to-column connections and related structural components. Engineering reports further identified widespread structural vulnerabilities affecting the integrity of the building. On February 27, 2025, the City of Charleston issued an Order to Vacate requiring all occupants to vacate the Condominium Complex due to life-safety concerns. The Condominium Complex has remained unoccupied since that date. After being presented with projected repair costs exceeding $150 million and projected demolition costs of approximately $11 million, most of the unit owners voted not to pursue repair or reconstruction.

The closure of the Condominium Complex created significant financial distress for the 181 unit owners. Dockside made efforts to market and sell all assets before filing for bankruptcy, but those efforts were unsuccessful. Dockside's Board ultimately determined that Chapter 11 relief was necessary to preserve value, centralize disputes among co-owners, and implement an orderly disposition strategy under court supervision. Dockside commenced this chapter 11 case on December 29, 2025 (the "Petition Date") and continues to operate as debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

2

Dockside's stated strategy in this case is a coordinated sale of the Condominium Complex pursuant to 11 U.S.C. § 363(h). Dockside's amended schedules[3] disclose assets of $4,009,204.23; secured liabilities of $2,871,930.49, unsecured liabilities of $11,625,757.26 and total liabilities of $14,497,687.75; unliquidated claims against the Arch Specialty Insurance Company, Old Republic Union Insurance Company, and CUMIS Specialty Insurance Company ("Insurer Defendants") of up to $54,000,000.00; and the Lawsuit, listed in Schedule E/F as a non-priority, unsecured claim of $622,983.26.[4]

Dockside is the governing association for the Dockside Horizontal Property Regime and owns unit 3-F in the Condominium Complex. The Master Deed and Restated and Amended Bylaws of Dockside Association, Inc. ("Bylaws") mandate that Dockside shall purchase and maintain insurance policies covering property loss, public liability, and Directors' and Officer's liability for the benefit of the Association, the owners of units, and their respective mortgagees.[5] The Bylaws state that Dockside is irrevocably appointed agent for each co-owner to adjust all claims arising under insurance policies purchased by Dockside, and to execute and deliver releases upon payment of claims.[6] Further, the Bylaws mandate that the premiums of the insurance policies would be paid by Dockside as a common expense and that proceeds of the insurance policies shall be distributed to or for the benefit of beneficial owners. Specifically, the Bylaws state:

---

[3] ECF No. 77.
[4] ECF No. 2.
[5] ECF No. 121, Exhibit A, p. 18.
[6] *Id.*

> Proceeds of insurance policies received by the Association shall be distributed to or for the benefit of the beneficial owners in the following manner: (a) If a damaged property for which the proceeds are paid is to be repaired or reconstructed, the proceeds shall be paid to defray the costs thereof as elsewhere provided. Any proceeds remaining after defraying such costs shall be distributed to the beneficial owners, remittances to Co-Owners and their mortgagees being payable jointly to them. This is a covenant for the benefit of any mortgagee of an Apartment and may be enforced by said mortgagee. (b) If it is determined in a manner elsewhere provided that the damage for which the proceeds are paid shall not be reconstructed or repaired, the proceeds shall be distributed to the beneficial owners, remittances to Co-Owners and their mortgagees being payable jointly to them. This is a covenant for the benefit of any mortgagee of an Apartment and may be enforced by him/her. . . .[7]

The principal insurance policies relevant here are: (i) the subscription Commercial Property Policy, effective March 30, 2024, through March 30, 2025, issued on a subscription basis by Arch Specialty Insurance Company (70%), Old Republic Union Insurance Company (15%), and CUMIS Specialty Insurance Company (15%) (the "Property Policy")[8]; (ii) the Commercial General Liability Policy issued by Richmond National Insurance Company, effective March 30, 2024, through March 30, 2025 (the "Liability Policy")[9]; and (iii) the Not-For-Profit Organization Management Liability (Directors and Officers) Policy issued by Atlantic Specialty Insurance Company, effective March 30, 2024, through March 30, 2025 (the "D&O Policy").[10] Each policy identifies Dockside as the named insured or first named insured.[11]

---

[7] *See* ECF No. 121, Exhibit A, p. 18.
[8] *See* ECF No. 121, Exhibit B.
[9] *See* ECF No. 121, Exhibit C.
[10] *See* ECF No. 121, Exhibit D.
[11] *See* ECF No. 121, Exhibit B, p. 6; Exhibit C, p. 2; Exhibit D, pp. 16–17.

## PROCEDURAL HISTORY

Wiggins purchased units 10-F and 10-G in the Condominium Complex in April 2022. After the residents of the Condominium Complex were ordered to vacate, Wiggins submitted a claim under the Property Policy on the basis that the structural engineering findings rendered the Condominium Complex unsafe and uninhabitable, causing Wiggins a direct, physical total constructive loss.[12] Wiggins's claim under the Property Policy was denied on the basis that Wiggins is not an insured under the Property Policy and has no standing to make a claim.[13] After Wiggins's claim was denied, Dockside informed the Market Insurers of its intent to make a claim under the Property Policy.[14] In response, the Market Insurers requested certain information and documents from Dockside pertaining to the structural problems with the Condominium Complex and formally reserved their right to deny coverage.

After his claim under the Property Policy was denied, Wiggins filed a complaint in state court[15] (the "Lawsuit") on October 14, 2025, against Dockside and the Insurer Defendants asserting claims for: breach of contract and bad faith by the Insurer Defendants; breach of fiduciary duty against Dockside for failure to procure adequate insurance and present and prosecute claims on behalf of owners; fraudulent concealment and negligent misrepresentation against Dockside, based

---

[12] *See* ECF No. 121, Exhibit E-1.
[13] *See* ECF No. 121, Exhibit E-1.
[14] *See* ECF No. 121, Exhibit E-2.
[15] *Wiggins v. Arch Specialty Ins. Co., et al.,* Case No. 2025-CP-10-05768 (S.C. Ct. of Common Pleas Oct. 14, 2025).

on nondisclosure of known structural defects during Wiggins's purchase process; and breach of contract—specifically, the Bylaws—against Dockside arising from their failure to adequately insure Wiggins's property and timely submit claims under insurance policies. The Complaint seeks relief in the amount of Wiggins's fractional regime-share allocation of insurance coverage limits under the Property Policy in the amount of $622,983.26.

The Insurer Defendants removed the Lawsuit to federal court on November 21, 2025.[16] Shortly after the case was removed to District Court, the Insurer Defendants moved for realignment of Dockside as a plaintiff in the Lawsuit.[17] Wiggins filed a response in opposition to the motion for realignment[18] and moved to remand the Lawsuit back to state court.[19]. The Insurer Defendants have moved for dismissal of the Complaint.[20] The District Court did not rule on any of these pleadings before the Lawsuit was stayed due to Dockside's chapter 11 petition.

After the Lawsuit was filed, Dockside notified the insurer of the D&O Policy, Atlantic Specialty Insurance Company ("ASIC"), of the Lawsuit and made a claim for coverage and legal defense under the D&O Policy.[21] ASIC denied Dockside the requested coverage.[22] Dockside then issued a formal Notice of Bad Faith and Demand for Defense and Indemnity on January 6, 2026.[23] ASIC's coverage counsel

---

[16] *Wiggins v. Arch Specialty Ins. Co., et al,* Case No. 2:25-cv-13509-BHH (D.S.C. Nov. 21, 2025).
[17] Case No. 2:25-cv-13509-BHH, ECF No. 6.
[18] *Id.*, ECF. No. 26.
[19] *Id.*, ECF No. 24
[20] *Id.*, ECF No. 28.
[21] *See* ECF No. 121, Exhibit E-4.
[22] ECF No. 121, Exhibit E-3.
[23] ECF No. 121, Exhibit E-4.

6

reaffirmed the initial denial on January 13, 2026.[24]

On February 4, 2026, Dockside filed Applications to Employ Mark C. Tanenbaum and Bundy McDonald, LLC, as special insurance coverage and litigation counsel for the purposes of investigating, negotiating, and, if necessary, prosecuting Dockside's claims under the insurance policies.[25] These applications were granted.[26]

On March 17, 2026, Dockside filed a complaint in District Court for declaratory judgment and breach of contract against the Insurer Defendants.[27] On May 5, 2026, Wiggins filed a proof of claim asserting an unsecured, non-priority claim against Dockside of $622,983.26, citing the Lawsuit as the basis for the claim.[28] Eight claims were filed prior to deadline for non-governmental entities to file claims:

a. Claim 1-1: An unsecured, non-priority claim in the amount of $7,230.79 filed by Dominion Energy South Carolina.
b. Claim 2-1: An unsecured priority claim of $100.00, and an unsecured, non-priority claim of $100.00, filed by the Internal Revenue Service.
c. Claim 3-1: An unsecured, non-priority claim in the amount of $220,316.27 filed by Tyler A. Lindsey.
d. Claim 4-1: A secured claim in the amount of $509,712.75 filed by Selene Finance LP.
e. Claim 5-1: Wiggins's claim, as described in the preceding paragraph.
f. Claim 6-1: A secured claim in the amount of $2,197,188.54 filed by First-Citizens Bank & Trust Company.
g. Claim 7-1: A secured claim in the amount of $722,795.63 filed by

---

[24] ECF No. 121, Exhibit E-5.
[25] ECF Nos. 65 and 66.
[26] ECF Nos. 113 and 114.
[27] *See Dockside Assoc., Inc. v. Arch Specialty Ins. Co., et al.,* No. 2:26-cv-01132-BHH (D.S.C. Mar. 17, 2026).
[28] *See* Claim 5-1.

First-Citizens Bank & Trust Company.

h. Claim 8-1: An unliquidated claim for amounts due and owing under insurance policies filed by Arch Specialty Insurance Company.

The total amount claimed by creditors is $4,280,427.24. The total amount of secured claims in this case is $3,429,696.92.

Wiggins now requests relief from the automatic stay, pursuant to 11 U.S.C. § 362(d)(1), so that he may continue to prosecute the Lawsuit.

## DISCUSSION AND CONCLUSIONS OF LAW

### I.   The Automatic Stay

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G) and the Court has the authority to issue a final order pursuant to 28 U.S.C. § 157(b)(1). *See In re Nexus Commc'ns, Inc.*, 55 B.R. 596, 598 (Bankr. E.D.N.C. 1985) (noting that a motion to lift the automatic stay is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G)). A decision to lift the automatic stay under section 362 is within the discretion of the bankruptcy judge and may only be overturned on appeal for abuse of discretion. *Robbins v. Robbins (In re Robbins)*, 964 F.2d 342, 345 (4th Cir. 1992), *as amended* (May 27, 1992) (citing *In re Boomgarden*, 780 F.2d 657, 660 (7th Cir.1985)).

"The automatic stay set forth in 11 U.S.C. § 362(a) is a statutory injunction provided by the Bankruptcy Code which serves to give debtors a breathing spell, by freezing the collection of debts and other actions in most judicial proceedings, so they can address their debts through the bankruptcy process." *In re Badalamenti*, 668 B.R. 382, 388 (Bankr. D.S.C. 2025); *see also In re Parast*, 612 B.R. 710, 716

(Bankr. D.S.C. 2020) (noting that this breathing spell provides a chapter 11 debtor

the "opportunity to propose a structured reorganization plan to repay all creditors").

Section 362(a) provides, in pertinent part, that the bankruptcy petition

operates as a stay of:

> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the [bankruptcy case], or to recover a claim against the debtor that arose before the commencement of the [bankruptcy case];
> (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the [bankruptcy case];
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . .

11 U.S.C. § 362(a). The automatic stay enjoins proceedings that seek to determine

the division of property that is property of the estate. 11 U.S.C. § 362(b)(2)(A)(iv).

When a bankruptcy is filed, most judicial actions against the debtor

commenced before the filing of the petition are automatically stayed. *In re Robbins*,

964 F.2d at 345 (citing 11 U.S.C. § 362(a)(1)). 11 U.S.C. § 541(a)(1) defines property

of the estate as "all legal or equitable interests of the debtor in property as of the

commencement of the case." The scope of this definition is broad and is intended to

include "all kinds of property, including tangible or intangible property." *In re Beach*

*First Nat. Bancshares, Inc.*, 451 B.R. 406, 408 (Bankr. D.S.C. 2011) (citing *In re*

*Baltimore Marine Indus.*, 476 F.3d 238, 240 (4th Cir.2007); *In re CyberMedica, Inc.*,

280 B.R. 12, 15 (Bankr.D.Mass.2002) (quoting S.Rep. No. 95–989, 95th Cong., 1st

Sess. 82 (1978))).

"[I]t is well-settled that a debtor's liability insurance is considered property of the estate." *In re Celsius Network LLC*, 652 B.R. 34, 42 (Bankr. S.D.N.Y. 2023) (citing *In re MF Global Holdings Ltd.*, 469 B.R. 177, 190 (Bankr. S.D.N.Y. 2012)); *see also A.H. Robins Co. v. Piccinin (In re A.H. Robins Co., Inc.)*, 788 F.2d 994, 1001 (4th Cir. 1986); *In re Davis*, 730 F.2d 176, 184 (5th Cir.1984). Whether proceeds of a directors' and officers' liability policy are property of a debtor's bankruptcy estate should be analyzed considering the facts of the case. *In re Beach First Nat. Bancshares, Inc.*, 451 B.R. at 409 (citing *CyberMedica*, 280 B.R. at 16; *In re Downey Fin. Corp.*, 428 B.R. 595, 603 (Bankr. D. Del. 2010)) ("Cases determining whether the proceeds of a liability insurance policy are property of the estate are controlled by the language and scope of the specific policies at issue."). Most courts require a debtor to have, at minimum, a direct interest in the proceeds of a D&O policy in order for proceeds to qualify as property of the estate. *Id.* (citing *CyberMedica*, 280 B.R. at 16). *See also Downey Fin. Corp.*, 428 B.R. at 603 ("[W]hen the liability insurance policy only provides direct coverage to the directors and officers, courts generally hold that the proceeds are not property of the estate."); *In re Petters Co., Inc.*, 419 B.R. 369, 376 (Bankr. D. Minn.2009) ("[W]hen a policy provides coverage only to directors and officers, courts will generally rule that the proceeds are not property of the estate.") (quoting *In re World Health Alternatives, Inc.*, 369 B.R. 805, 810 (Bankr. D. Del. 2007).

If both the debtor and the directors and officers have direct interests in the proceeds, the proper result becomes less clear. *Celsius*, 652 B.R. at 42. "Several

10

courts have stated the standard in this situation is 'the proceeds will be property of the estate if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution.'" *Id.* (citing *Downey Fin. Corp.*, 428 B.R. at 603); *see also Petters Co.*, 419 B.R. at 377 (explaining the reasoning for including cash proceeds in the bankruptcy estate, stating that when defense costs of other insureds exhaust policy limits, the estate is increasingly exposed to third-party claims and will be unable to collect insurance proceeds to satisfy any claims of the debtor); *World Health Alternatives*, 369 B.R. at 810 ("When a policy covers the debtor and its directors and officers, and there is risk that payment of proceeds to the directors and officers will result in insufficient coverage of the debtor, then the proceeds are property of the estate and any attempts to obtain the proceeds are prohibited under the automatic stay."). The test has also been articulated differently, as "whether 'the debtor's estate is worth more with [the proceeds] then [sic] without them.'" *Celsius*, 652 B.R. at 42 (quoting *CyberMedica*, 280 B.R. at 17).[29]

Wiggins bears the burden of proving that cause exists for granting relief from the automatic stay. *In re Flint*, 640 B.R. 869, 876 (Bankr. D.S.C. 2022). If Wiggins meets his burden of proof, the burden shifts to Dockside to demonstrate a lack of cause. 11 U.S.C. § 362(g); *In re Badalamenti*, 668 B.R. 382, 390 (Bankr. D.S.C.

---

[29] At the hearing, the Court asked Dockside to clarify whether only directors and officers were eligible for coverage under the D&O Policy. Dockside asserted that the directors and officers of Dockside and Dockside are one in the same—insurance coverage of the directors and officers would cover Dockside, and vice versa. Further, the D&O Policy specifically identifies Dockside as an Insured. The D&O Policy provides coverage for "Directors, Officers, & Organization Liability".

11

2025); *In re Ebersole*, 440 B.R. 690, 693 (Bankr. W.D. Va. 2010); *In re Joyner*, 416 B.R. 190, 193 n.1 (Bankr. M.D.N.C. 2009).

## II.   "Cause" and the *Robbins* Factors

Pursuant to 11 U.S.C. § 362(d)(1), the bankruptcy court may grant relief from the automatic stay "for cause." "Because the Code does not define 'cause,' 'courts should look at the case-specific facts and the totality of the circumstances in order to determine whether sufficient cause exists to grant relief from the automatic stay.'" *In re Mitchell*, 546 B.R. 339, 344 (Bankr. D.S.C. 2016) (quoting *In re Beach First Nat'l Bancshares, Inc.*, 451 B.R. at 410).

"The legislative history of § 362 is abundantly clear on the point that Congress intended the bankruptcy courts to be required to lift the stay in appropriate circumstances." *Elliott v. Hardison*, 25 B.R. 305, 308 (E.D. Va. 1982). The Senate Report accompanying the Bankruptcy Reform Act of 1978 stated that:

> Subsection (d) requires the court, upon motion of a party in interest, to grant relief from the stay for cause, such as by terminating, annulling, modifying, or conditioning the stay. The lack of adequate protection of an interest in property is one cause for relief, but is not the only cause. Other causes might include the lack of any connection with or interference with the pending bankruptcy case. Generally, proceedings in which the debtor is a fiduciary or involving postpetition activities of the debtor, need not be stayed because they bear no relationship to the purpose of the automatic stay, which is protection of the debtor and his estate from his creditors. Upon the court's finding that the debtor has no equity in the property subject to the stay and that the property is not necessary to an effective reorganization of the debtor, the subsection requires the court grant relief from the stay[.] . . .

S. REP. NO. 989, 95TH CONG., 2D SESS. 50 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5838.

"The 'first and primary purpose' of a chapter 11 case 'is to ascertain whether a fair reorganization of the debtor can be achieved.'" *A.H. Robins Co.*, 788 F.2d at 1012. The collective process of chapter 11 "is intended to, among other things, allow a debtor to catch its financial breath and develop a cohesive reorganization plan; provide consistency and certainty in the resolution of matters potentially affecting the debtor's reorganization; and ensure fair and equal treatment of the debtor's creditors." *Camac Fund, L.P. v. McPherson (In re McPherson)*, 630 B.R. 160, 164 (Bankr. D. Md. 2021).

Courts recognize that stay relief should be denied where continuation of litigation would impair a debtor's ability to formulate and confirm a feasible plan. *See Charter Int'l Oil Co. v. Gen. Oil Distribs., Inc. (In re Gen. Oil Distribs., Inc.)*, 33 B.R. 717, 718 (Bankr. E.D.N.Y. 1983) (holding that modification of the stay would have had a detrimental impact on the debtor's efforts to formulate and solicit acceptances for a plan). "The purpose of the automatic stay is to preserve what remains of the debtor's insolvent estate and to provide a systematic equitable liquidation procedure for all creditors, secured as well as unsecured, [. . .] thereby preventing a 'chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts.'" *Holtkamp v. Littlefield (In re Holtkamp)*, 669 F.2d 505, 508 (7th Cir.1982). In addition to considering the purpose of the automatic stay, the Court must consider whether modifying the stay in this case will be in "harmony with the Code's policy of quickly and efficiently formulating plans for repayment and reorganization." *Id.*

13

In determining whether there is cause to lift the automatic stay, "[t]he court must balance potential prejudice to the bankruptcy debtor's estate against the hardships that will be incurred by the person seeking relief from the automatic stay if relief is denied." *Robbins*, 964 F.2d. at 345 (citing *In re Peterson*, 116 B.R. 247, 249 (D. Colo. 1990)). The Fourth Circuit has therefore instructed courts considering whether to lift the stay "for cause" to examine the following factors, (commonly referred to as the "*Robbins* factors"):

> (1) whether the issues in the pending litigation involve only state law, so the expertise of the bankruptcy court is unnecessary; (2) whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court; and (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court.

*Robbins*, 964 F.2d. at 345 (citations omitted); *see also In re Charleston Affordable Housing, Inc.*, C/A No. 09–01020–dd, slip op. at 4–5, 2009 WL 9071877 at *3 (Bankr. D.S.C. June 9, 2009) (focusing on "whether judicial economy will be served by returning the parties to state court or whether litigation in the bankruptcy court would impair progress" in the bankruptcy case). "For decades, courts in [the Fourth Circuit] have recognized *Robbins* as the controlling authority for deciding motions to lift an automatic stay." *Herlihy v. DBMP, LLC*, 167 F.4th 142, 150 (4th Cir. 2026). *See, e.g., In re Lee*, 461 F. App'x 227, 231–33 (4th Cir. 2012); *In re McCullough*, 495 B.R. 692, 697–98 (W.D.N.C. 2013); *In re Badalamenti*, 668 B.R. at 390; *In re Parast*, 612 B.R. at 722.

14

### III.    Discussion and Analysis

The Motion seeks relief from the automatic stay pursuant to 11 U.S.C. §

362(d)(1). Wiggins contends there is cause to lift the stay because: (1) the Lawsuit

involves only issues of state law such that the expertise of this Court is

unnecessary; (2) modification of the stay to allow the Lawsuit to move forward in a

different forum will promote judicial economy; and (3) the bankruptcy estate can be

fully protected by language conditioning any potential recovery by Wiggins in the

lawsuit solely to proceeds from the Liability Policy, which has a stated limit of

$1,000,000.00 per occurrence.[30] *See Robbins*, 964 F.2d. at 345. The Motion further

avers Wiggins will not engage in enforcement or collection actions against Dockside

or property of the estate absent further order of this Court, and therefore the

balance of hardships indicates the Motion should be granted. *Id.*

At the outset, the Court finds that the Property Policy and Liability Policy

are property of the estate, as are Dockside's potential claim for coverage under

those policies. *Celsius*, 652 B.R. at 42. Dockside is the named or first named insured

under those policies, and any recovery under those policies could materially affect

the value available to the estate and similarly situated creditors.

The present record is insufficient to determine whether proceeds of the D&O

Policy constitute property of the estate or the claims asserted in the Lawsuit fall

---

[30] At the hearing on the Motion, Wiggins's counsel stated Wiggins would be willing to limit his
recovery to proceeds from the D&O Policy, which has a stated limit of $1,000,000.00 per occurrence
and an aggregate limit of $2,000,000.00. This statement contradicts with the language in the Motion
stating Wiggins would limit his reward to a portion of the proceeds available under the Liability
Policy. Given the Court's finding that relief from the stay for cause is not appropriate at this time,
there is no need to resolve this ambiguity.

within coverage available to Dockside. The D&O Policy provides "Directors, Officers, & Organization Liability" coverage and therefore may provide coverage not only to individual directors and officers, but also potentially to Dockside itself. *Celsius*, 652 B.R. at 42. While the D&O Policy's aggregate recovery limit of $2,000,000.00 is much lower than the Property Policy's aggregate limit of $54,000,000.00, the estate would certainly be more valuable if the D&O proceeds were considered estate property. *Id*. The Court finds that the estate possesses at least a colorable interest in potential D&O recoveries sufficient to warrant the continued protection of the automatic stay. Lifting the stay to allow Wiggins to pursue the Lawsuit only as to the D&O policy would result in both Dockside expending unnecessary resources prior to confirmation and piecemeal litigation.

Depletion of available insurance proceeds would adversely affect the estate. Dockside's schedules identify potential insurance recoveries as some of the estate's most significant assets. Dockside retained special insurance counsel to pursue recovery under those policies for the benefit of the estate. Said insurance counsel has already filed suit against the Insurer Defendants in the United States District Court for the District of South Carolina. Payment of defense costs, indemnity obligations, or other recoveries to individual claimants could reduce aggregate policy limits otherwise available to the estate and other claimants. Under these circumstances, the estate is worth more with preservation of the insurance proceeds than without them, and efforts to obtain or control those proceeds implicate property interests protected by § 362(a)(3).

16

The Court concludes that Wiggins has failed to demonstrate sufficient cause for relief from stay under the *Robbins* framework. Dockside has demonstrated that continuation of the Lawsuit would interfere with administration of the estate, jeopardize preservation of potentially significant insurance assets, and impair the orderly restructuring process contemplated by Chapter 11.

### a. *Robbins* Factors

#### i. Do the issues in the pending litigation involve only state law such that the expertise of the bankruptcy court is unnecessary?

Applying the first of the *Robbins* factors, the Court finds that the causes of action set forth in the Lawsuit—breach of contract (against Insurer Defendants), breach of fiduciary duty (against Dockside), fraudulent concealment (against Dockside), negligent misrepresentation (against Dockside), breach of contract (against Dockside), and bad faith (against Insurer Defendants)— are not matters on which "state courts have special expertise and for which federal courts owe significant deference." *See Robbins*, 964 F.2d at 345.

The claims asserted and relief requested in the Lawsuit fall under the purview of state law. *See In re Reyna*, 657 B.R. 845, 853 (Bankr. E.D. Va. 2024) (citing *Butner v. United States*, 440 U.S. 48, 56-57 (1979)). The Fourth Circuit has held that the presence of state law claims does not alone constitute "cause" for relief from stay. *Robbins*, 964 F.2d at 345. The inquiry is not whether a state court is competent to apply state law; it is whether allowing the litigation to proceed would interfere with the bankruptcy process. *Id*. "The majority of debts considered and determined by bankruptcy courts involve the application of state law." *In re*

*Mitchell*, 546 B.R. 339, 347 (Bankr. D.S.C. 2016). "One of the primary purposes of this Court is to determine the validity and enforceability of claims against debtors and whether such claims are of the type that may be pursued despite the automatic stay or beyond discharge." *Id.* "Unlike litigation involving state law equitable distribution[31] or personal injury actions, litigation of liability in a breach of contract action is within the bounds of the bankruptcy court's expertise and purpose regardless of which state's law is applied." *Id.*

Bankruptcy courts routinely hear and determine questions of breach of contract, breach of fiduciary duty, fraudulent concealment, negligent misrepresentation, and bad faith. *See, e.g., In re Mitchell*, 546 B.R. at 347; *In re Granati*, 271 B.R. 89, 95 (Bankr. E.D. Va. 2001) (holding bankruptcy courts have exclusive jurisdiction to determine the dischargeability of debts alleged to be excepted from discharge on the ground of breach of fiduciary duty); *Glencove Holdings, LLC v. Bloom (In re Bloom)*, 634 B.R. 559, 580 (10th Cir. BAP (Colo.) 2021), *aff'd*, No. 22-1005, 2022 WL 2679049 (10th Cir. July 12, 2022) (affirming the bankruptcy court's finding that a creditor was entitled to damages from debtor for fraudulent concealment under Colorado law); *Hovis v. Gen. Dynamics Corp., (In re Marine Energy Sys. Corp.)*, 362 B.R. 247, 256 (Bankr. D.S.C. 2006), *aff'd sub nom., In re Hovis*, 396 B.R. 895 (D.S.C. 2007), a*ff'd in part sub nom., In re Marine Energy Sys. Corp.*, 299 F. App'x 222, 2008 WL 4820128 (4th Cir. 2008) (holding a defendant

---

[31] "Equitable distribution" is defined as the division of marital property by a court in a divorce proceeding, under statutory guidelines that provide for a fair, but not necessarily equal, allocation of the property between the spouses. EQUITABLE DISTRIBUTION, Black's Law Dictionary (12th ed. 2024).

18

in an adversary proceeding was entitled to summary judgment as to the trustee's

action for fraud and negligent misrepresentation); and *In re Harmony Holdings,*

*LLC,* 393 B.R. 409, 421 (Bankr. D.S.C. 2008) (finding a party seeking relief from

stay under § 362(d)(1) for debtor's bad faith in filing a chapter 11 case failed to meet

their burden). Wiggins's claims are within the bounds of the bankruptcy court's

expertise and purpose regardless of the fact that they are grounded in state law. *See*

*In re Mitchell,* 546 B.R. at 347.

Accordingly, although the Lawsuit involves state-law causes of action, the

Court finds that bankruptcy courts routinely adjudicate such issues in the claims-

allowance and estate-administration context. The first *Robbins* factor is therefore

neutral or weighs slightly against relief from stay.

### ii. Will modifying the stay promote judicial economy and will there be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court?

Judicial economy will not be advanced by granting Wiggins relief from the

stay. First, as to the merits of Wiggins's case, the Lawsuit is in its infancy. None of

the Insurer Defendants have filed an Answer in District Court. Upon information

and belief, the parties to the Lawsuit have not engaged in discovery. If relief from

stay was granted, Dockside would be entering a case with a complex procedural

posture that would require substantial briefing on topics ranging from insurance

coverage to joinder, dismissal, and remand, before the Court could assess the merits

of Wiggins's argument. Those unresolved procedural matters would likely generate

additional expense and delay, therefore undermining judicial economy and

interfering with centralized administration of this Chapter 11 case. Dockside is a small business navigating an unprecedented challenge. Its attention is better focused on maximizing recovery for the co-owners than on defending itself against the claims levelled in the Lawsuit.

Second, Dockside's insurance counsel has already filed an action against the Insurer Defendants in the District Court. If the stay were lifted, the Lawsuit would proceed on a parallel track to both Dockside's case against the Insurer Defendants and this chapter 11 case. Between the Lawsuit, Dockside's action in District Court, and this bankruptcy case, inconsistent judgments could be entered for similarly situated parties. *See In re Conejo Enterprises, Inc.*, 96 F.3d 346, 353 (9th Cir. 1996) ("By staying the state action, the bankruptcy court promoted judicial economy and efficiency by minimizing the duplication of litigation in two separate forums and preventing litigation of a claim that may have been discharged in bankruptcy proceedings."). Permitting multiple legal actions to move forward concerning Dockside's entitlement to insurance proceeds could interfere with the estate's coordinated recovery strategy, complicate coverage determinations, and create competing claims to potentially limited proceeds. The duplication of these efforts to reach the proceeds of Dockside's insurance policies does not favor judicial economy. *See In re Celsius Network LLC*, 642 B.R. at 504.

Third, Wiggins has filed a proof of claim in this case in the amount of damages he seeks in the Lawsuit. If Wiggins's claim is undisputed or, if disputed, allowed through the claims allowance process, Wiggins will receive a pro rata

20

distribution. *See, e.g., Celsius*, 642 B.R. at 499. Formulating a plan that maximizes value and provides an efficient and equitable distribution to the debtor's creditors is central to the restructuring process. *Id.*, 642 B.R. at 503. Addressing Wiggins's claim through the centralized bankruptcy process would not delay and interfere with this case, but allowing the Lawsuit to proceed would interfere with and delay Dockside's reorganization efforts and potentially result in a disproportionate recovery to one party. *Id.*

The Motion, if granted, risks conferring Wiggins the benefit of an opportunity to obtain a larger recovery than the 179 other (non-Dockside) co-owners, who would be barred from pursuing their own individual claims against Dockside during this chapter 11 case. *Id.* Alternatively, granting the Motion risks opening the floodgates for lawsuits against Dockside and the Insurer Defendants by said co-owners, or any other creditors who did not file actions before this case was initiated and wish to maximize their own recovery. *Id.* (citing *In re SunEdison, Inc.*, 557 B.R. 303, 308–09 (Bankr. S.D.N.Y. 2016)) (finding relief from stay should not be granted, in part, due to the risk of "encourag[ing] other claimants to file their own stay relief motions"). Either of these outcomes would interfere with the purpose of chapter 11, which is intended to "allow a debtor to catch its financial breath and develop a cohesive reorganization plan; provide consistency and certainty in the resolution of matters potentially affecting the debtor's reorganization; and ensure fair and equal treatment of the debtor's creditors." *In re McPherson,* 630 B.R. at 164.

If the Lawsuit continues, Dockside will be immediately prejudiced by the

21

demands of responding to the motions for joinder, dismissal, and remand that have been stayed due to Dockside's bankruptcy. Dockside will continue to be prejudiced by the demands of the Lawsuit as it maintains a parallel action to determine coverage under the Property Policy, formulates a chapter 11 Plan, and markets the Condominium Complex for sale. Dockside's focus should be on pursuing its remedies under the insurance policies and restructuring its debt for the benefit of owners, creditors, and stakeholders—not on the Lawsuit. Efficiency and judicial economy favor a centralized analysis of the value of the insurance proceeds and distribution to claimants like Wiggins through a chapter 11 Plan. The second *Robbins* factor therefore weighs against granting relief from stay.

### iii. Will the estate be adequately protected by Wiggins's offer to seek enforcement of any judgment through this Court and limit his recovery to his fractional share of the insurance proceeds?

Wiggins proposes to limit any recovery to available insurance proceeds and to seek enforcement of any judgment solely through this Court.[32] Those limitations partially mitigate concerns regarding direct collection efforts against estate assets. However, the Court finds that the proposed limitations do not presently eliminate the risk of prejudice to the estate.

The estate has a direct interest in the Property Policy and the Liability Policy. Dockside is the named or first named insured under those policies, and the estate is actively pursuing evaluation and potential recovery under them for the benefit of creditors and stakeholders. Litigation seeking to obtain or allocate those

---

[32] ECF No. 103, p. 6.

proceeds outside the centralized bankruptcy process risks depletion of policy limits, inconsistent determinations concerning entitlement to proceeds, and interference with the estate's coordinated recovery strategy.

As to the D&O Policy, the record does not permit a definitive determination of whether proceeds of the D&O Policy constitute property of the estate or whether particular claims asserted in the Lawsuit implicate coverage available to Dockside under the D&O Policy. Nevertheless, the Court finds that continuation of the stay is appropriate to permit Dockside to evaluate potential claims, coverage positions, and litigation strategy relating to the D&O Policy, and to avoid diverting Dockside's resources to duplicative litigation. Under these circumstances, the Court concludes that the third *Robbins* factor is neutral or weighs slightly against stay relief.

### iv.  Does the balance of hardships favor granting the Motion?

In addition to the three factors addressed above, *Robbins* instructs this court to balance potential prejudice to the estate against the hardships that will be suffered by Wiggins if the Motion is denied. Unsecured creditors like Wiggins bear a heavy burden in proving that the balance of hardships favors lifting the stay, and he simply has not met the burden here. *See Celsius* 642 B.R. at 504 (citing *In re Conejo Enterprises, Inc.*, 96 F.3d at 353). *See also In re Residential Capital, LLC*, 508 B.R. 838, 848 (Bankr. S.D.N.Y. 2014) ("If the movant is an unsecured creditor, the policies of the automatic stay weigh against granting the relief requested.").

Wiggins has not demonstrated that he will be more prejudiced than any other owner or potential creditor by delaying his recovery until a plan is in place. The

23

Lawsuit alleges Wiggins suffered particular injuries—namely, purchasing two units in the Condominium Complex after Dockside had been made aware of the profound structural issues with the buildings, and not being informed of those defects by Dockside before the purchase was finalized. To the extent that he is the sole owner who purchased a unit in the Condominium Complex after Dockside discovered the structural defects, but before the evacuation order, he may indeed be more prejudiced than the other owners. The Court noted as much on the record at the hearing.

However, neither Wiggins nor Dockside have presented evidence on this point. The Court cannot determine if Dockside was aware of the structural deficiencies at the time Wiggins bought his units, or how many other owners may be entitled to damages for Dockside's alleged failure to disclose the structural deficiencies to prospective buyers. Further, the Bylaws appoint Dockside as agent for the co-owners for the purpose of obtaining insurance coverage for the Condominium Complex. All owners would suffer equal injury from Dockside's alleged failure to promptly and adequately present claims to the Insurer Defendants on behalf of the owners. With the information available to the Court at this time, Wiggins appears similarly situated to the other unit owners who have seen the value of their investment in the Condominium Complex vanish before their eyes. Those owners are also entitled to a share of any insurance proceeds that are recovered. The record before the Court indicates Wiggins will not sustain more significant harm than the other owners if the Motion is denied. *See Celsius*, 642

B.R. at 504.

Further, the Fourth Circuit has recently noted that a litigant's desire to recover under pre-petition civil claims before distributions are made to the other creditors in bankruptcy does not constitute sufficient cause to lift the automatic stay. *See Herlihy*, 167 F.4th at 150 (affirming the bankruptcy court's finding that a potential delay to a movant's recovery from the debtor in a non-bankruptcy civil suit is speculative and therefore an insufficient basis for relief from the stay). Wiggins has filed a proof of claim in this case. Creditor claims are routinely addressed through the structured processes provided by the Bankruptcy Code, including the claims-allowance mechanism under 11 U.S.C. § 502 and ability to receive distribution under a confirmed plan. If Wiggins's claim is allowed, he will likely receive some distribution consistent with a distribution percentage made to other unit owners. The fact that Wiggins may receive a distribution from the estate later than he would obtain an award of damages in the Lawsuit is not sufficient cause for relief from the stay.

Finally, the Court finds that potential insurance recoveries are among the estate's most significant prospective assets. Dockside has filed suit against the Insurer Defendants and is, upon information and belief, actively evaluating and pursuing recovery under the Liability Policy and the D&O Policy. Piecemeal litigation between the co-owners and insurers concerning those policies could result in unnecessary defense expenditures, inconsistent determinations concerning entitlement to proceeds, and interference with the estate's coordinated efforts to

25

maximize value for creditors and unit owners. Preservation of the status quo for a limited period therefore serves the interests of orderly estate administration.

Forcing Dockside to participate in additional litigation over the potential insurance proceeds would distract and hinder Dockside from its efforts to reorganize its debt, sell the land where the Condominium Complex lies, and obtain recovery under its insurance policies. These efforts are essential to preserve the value of the estate for the benefit of all creditors. The balance of hardships weighs against granting relief from stay.

## CONCLUSION

This case arises from an extraordinary and deeply unfortunate set of circumstances affecting hundreds of individuals connected to the Condominium Complex, Wiggins among them. In addition to the emotional and logistical toll wrought by the evacuation order, some owners now face substantial financial hardship. Now that Dockside has filed a chapter 11 petition, the co-owners will have access to a limited pool of available assets for recovery. The bankruptcy process cannot fully remedy the disruption, uncertainty, and financial losses experienced by those forced to pack their possessions and leave their homes with little notice. It can, however, provide a structured and centralized forum intended to preserve, maximize, and fairly allocate whatever value may ultimately be recovered for the benefit of all creditors and stakeholders. Preserving that process by avoiding piecemeal litigation that could diminish estate assets or interfere with coordinated recovery efforts remains a central purpose of the automatic stay in this case. In

consideration of the *Robbins* factors and the competing hardships of the parties, the

Court denies the Motion without prejudice.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**05/20/2026**



L. Jefferson Davis IV

US Bankruptcy Judge
District of South Carolina

Entered: 05/20/2026